UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

STEPHEN C. BULL,
    PLAINTIFF

VS.

MICHAEL J. ASTRUE,[1]
COMMISSIONER OF SOCIAL
SECURITY,
    DEFENDANT

CASE NO. 1:07CV00031
(SPIEGEL, J.)
(HOGAN, M.J.)

## REPORT AND RECOMMENDATION

Plaintiff filed his application for Supplemental Security Income in July, 1999. His application was denied both initially and upon reconsideration. Plaintiff then requested and obtained a hearing before an Administrative Law Judge (ALJ) at Cincinnati, Ohio in August, 2004. Plaintiff, who was represented by counsel, testified as did Vocational Expert, George Parsons and witness, Sherry Bull, Plaintiff's former spouse. The ALJ reached an unfavorable decision in December, 2004 and Plaintiff then requested review by the Appeals Council. In November, 2006, the Appeals Council denied review, following which Plaintiff timely filed his Complaint with this Court in January, 2007.

## STATEMENTS OF ERROR

Plaintiff asserts that the ALJ made four errors prejudicial to his case. Plaintiff asserts that "the ALJ improperly relied upon the opinions of non-treating physicians" and "the ALJ erred in finding that Plaintiff and Plaintiff's ex-wife were not credible." Plaintiff also asserts that "the ALJ erred by not finding Plaintiff disabled under Listing 12.02" and "[t]he ALJ erred by finding

---

[1] On February 12, 2007, Michael J. Astrue became Commissioner of Social Security. In accordance with Fed. R. Civ. P. 25(d)(1) and the last sentence of 42 U.S.C. §405(g), Michael J. Astrue is automatically substituted as the Defendant in this civil action.

that Plaintiff was able to perform a significant number of jobs in the national economy."

## PLAINTIFF'S TESTIMONY AT THE HEARING

Plaintiff received benefits for two closed periods previously. One period was from 1993 to 1996 and the other was from November, 1999 to December, 2000. He testified that he was 49 years of age on the date of the hearing and had completed the ninth grade. He is right-handed. He was trained as a welder in a ship yard welding program. Plaintiff related that he sees Dr. Winter at Core Behavioral twice per month and takes prescribed Zoloft, Remeron and Topamax. He estimated that he can stand for an hour "at the most" and can walk "a mile," but can sit indefinitely. Plaintiff described an injury to his right shoulder and to his brain, the latter of which required surgery and that his shoulder injury reduces the amount of weight he could lift. He indicated that he is "basically homeless" and lives with a variety of relatives, whom he helps with household chores.

He described the brain surgery as resulting from a "traumatic brain injury" and said that as a result, he has difficulty with concentration and short-term memory. Plaintiff estimated that he could concentrate for 30 minutes. His last job was 8 or 9 years ago and was with Ondwurst Fabricators. (Tr. 693-701).

Plaintiff's former wife, Sherry Bull, testified that she was married to Plaintiff for approximately 18 years until they parted ways in 1990. Mrs . Bull said that she still sees her former husband "from time to time." Mrs. Bull described Plaintiff as "not right" and further described his thinking process as "real slow." She attributes his cognitive problems to brain damage. (Tr. 701-704).

## THE VOCATIONAL EXPERT AND THE HYPOTHETICAL QUESTIONS

The first hypothetical question to the Vocational Expert asked him to assume the accuracy of medical reports filed by Dr. Ray (Exhibit B6F) and Dr. Berg (Exhibit B7F). The Vocational Expert said that Plaintiff could not return to his prior job as a heavy and semi-skilled welder, but

2

he could perform work as a machine welder, grinder, buffer and polisher or fabricator at the light and sedentary level.

The second hypothetical asked the Vocational Expert to accept as accurate the testimony of Plaintiff that he can sit, but can't be on his feet for more than 1 hour and can occasionally lift less than 50 lbs., but not overhead and with the right arm. Also forming a part of the hypothetical question was the assumption that Plaintiff has "very significant restrictions on his ability to remember short term." The Vocational Expert said that Plaintiff could physically perform the work, but that his memory problems would preclude remunerative employment. (Tr. 704-707).

### THE DECISION OF THE ADMINISTRATIVE LAW JUDGE

The ALJ related that Plaintiff's list of severe impairments included a post-traumatic brain injury, residuals from a right distal clavicle fracture and right ankle fracture and a depressive disorder. The ALJ considered "at least one" of the above to be severe, but he did not say which one. Nevertheless, the ALJ concluded that none met any Listing, nor did the impairments in combination meet any Listing. The ALJ found that Plaintiff had the residual functional capacity to lift/carry and push/pull 20 lbs. frequently and 25 lbs. occasionally. He could walk for 2 hours in a workday, but should not climb, balance or crawl. He can occasionally kneel, crouch, stoop and reach overhead with his right hand. The ALJ determined that Plaintiff had capacity to perform a number of light and sedentary jobs, which existed in representative numbers in the national economy.

### THE MEDICAL RECORD

Plaintiff's medical record is extensive, as is his history in processing claims for Social Security benefits. The instant application is Plaintiff's fourth. He was awarded benefits for alcoholism in the early 1990s, but those benefits ceased in January, 1997. His application for benefits in 1998 was denied. In 1999, Plaintiff's application for a closed period ending in December, 2000 and based upon a traumatic brain injury was granted. Thus we are concerned in

this application with the post-December, 2000, period.

In September, 1999, Plaintiff was examined by Mark Carter, M.D. in Frankfort, Kentucky. Dr. Carter reviewed x-rays of Plaintiff's right ankle and saw "evidence of a prior bimalleolar fracture" and "mild arthritic changes" and "mild loss of range of motion." Dr. Carter also noted a "history of right clavicle fracture," but "no evidence of impaired range of motion or function." (Tr. 202-205). In February, 2000, Thomas Watanabe, M.D. reported that Plaintiff suffered a "subdural hematoma requiring evacuation in November, 1999." He was put on Dilantin. (Tr. 217-221). Dr. Watanabe reported that Plaintiff's recent memory was "very good." (Tr. 222). The radiology report from Mercy Franciscan Hospital in October, 1999 indicated that Plaintiff sustained an "acute fracture of the right frontal bone"and a "left frontal lobe contusion" as a result of an assault. (Tr. 236). He was discharged to Drake hospital with "right-sided weakness" and difficulty swallowing. At discharge, Plaintiff had "some mild difficulties with cognitive function," and was sent to Manor Care Nursing Home, because he was homeless and the bone-flaps removed during surgery had to grow back, a situation which made him at risk for further head injury if discharged to the street. (Tr. 262-263). In January, 2000, Plaintiff complained of "significant memory problems." (Tr. 358).

In April, 2000, Dr. Watanabe reported that Plaintiff's short term memory was "3/3 immediately and 0/3 after three minutes." Dr. Watanabe also said that Plaintiff "demonstrates good ability to recall current events" and "good calculation ability." (Tr. 361).

A report from Dawn Bouman, Ph.D., clinical psychologist at Drake Hospital, reported in April, 2000 that the purpose of the surgery following Plaintiff's brain injury was to relieve pressure on the brain. Dr. Bouman said that Plaintiff was at Drake Hospital for six weeks following surgery and that his major complaint was memory loss. Testing showed that "attention was generally intact for short periods of time, but sustained attention was somewhat impaired by his slow thinking speed." Dr. Bouman reported that Plaintiff had "substantial difficulty with tasks involving memory." Dr. Bouman attributed Plaintiff's problem-solving difficulties, decreased thought speed and memory dysfunction to alcohol abuse, but stated that these impairments were "likely made worse" as a result of his head injury. (Tr. 389-392).

A psychological examination was done by Jerome Gabis, Psy.D., a clinical psychologist, in

4

August, 1990. Dr. Gabis diagnosed Plaintiff with Major Depressive Disorder, recurrent moderate to severe along with alcohol and polysubstance dependence. Dr. Gabis noted that Plaintiff's "capacity to establish, focus and alternate attention was within normal limits" and his "memory appears to be intact." (Tr. 411-413). A psychiatric assessment was made by Vicki Casterline, Ph.D. in December, 2001. Dr. Casterline diagnosed Plaintiff with both a cognitive disorder and major depression, but she considered neither to be severe. Dr. Casterline agreed with Dr. Gabis with regard to Plaintiff's memory and ability to concentrate because she stated that Plaintiff's "memory and concentration are intact." (Tr. 431-444).

Plaintiff's right ankle injury occurred in July, 1995 when he fell down an embankment while inebriated. He was treated at St. Francis-St. George Hospital. He had surgery for "open reduction and internal fixation of the trimalleolar fracture" and was discharged on crutches and given a prescription for Vicodin." (Tr. 451-452). The right clavicle injury occurred in March, 1998 and was also the result of a fall. John Wyrick, M.D., an orthopaedic surgeon, performed the surgery at University Hospital, which involved the insertion of pins. (Tr. 484). In April, 1998, Plaintiff returned to University Hospital for removal of the hardware. (Tr. 498-499).

A second psychiatric evaluation was done in November, 1997 by Stephen Vance, M.D., a psychiatrist. Dr. Vance diagnosed Plaintiff with alcohol dependence and polysubstance abuse, as well as anti-social personality. He assigned a GAF of 60. (Tr. 501-504).

A third psychiatric examination was conducted in December, 1997 by Robelyn Marlow, Ph.D., a clinical psychologist. Dr. Marlow felt that Plaintiff had a substance abuse disorder. She also stated that Plaintiff had a "moderate" limitation of his ability to concentrate and persist, but that his ability to understand and remember detailed instructions was "not significantly limited." (Tr. 506-518).

Plaintiff was examined in November, 1997 by Mary Johnson, M.D., who diagnosed him with "traumatic arthritis, right ankle." Dr. Johnson concluded that "the neurological examination was completely normal and all deep tendon reflexes are brisk." She also concluded that "manual motor muscle function is intact" as is flexion and extension of the ankle. Dr. Johnson did not find any evidence of chronic inflammation of the right ankle, and she attributed Plaintiff's unsteady gait to intoxication, not a functional impairment with Plaintiff's ankle. (Tr. 529-532 and 537). An x-

ray of Plaintiff's right ankle was read by Eli Rubenstein, M.D., in November, 1997. Dr. Rubenstein observed that there had been "bilateral fractures of the malleoli of the ankle with some degenerative changes." (Tr. 533).

Dr. Gabis did a repeat evaluation of Plaintiff in October, 2001. Dr. Gabis indicated that he first saw Plaintiff while he was residing at Manor House Nursing Home, after the occurrence of the traumatic brain injury and rehabilitative stay at Drake Hospital. Dr. Gabis diagnosed Plaintiff with polysubstance abuse and major depressive disorder. During his nursing home stay, Plaintiff's "cognitive and emotional functioning improved," but "deteriorated significantly when he was discharged into the community." The difference between Plaintiff's verbal and performance IQ scores led Dr. Gabis to think that Plaintiff had "diminished non-verbal reasoning." Dr. Gabis opined that Plaintiff "should have only mild difficulty in completing complex tasks." (Tr. 551-553).

In June, 2002, Plaintiff was evaluated by Guy Melvin, Ph.D., a clinical psychologist. Dr. Melvin opined that Plaintiff met Listing 12.09 and that he had polysubstance dependence, a cognitive disorder, a personality disorder and major depression in partial remission with medication. Dr. Melvin opined that Plaintiff had a marked limitation of his ability to maintain social functioning and a marked limitation of his ability to concentrate and persist. (Tr. 633-644).

In April, 2002, Plaintiff was evaluated by Michael Zoglio, M.D., (not "Zeglo" as he was referrer to by the Plaintiff, Defendant and the ALJ) a psychiatrist employed by Core Behavioral Mental Health Services East, a division of Talbert House. Dr. Zoglio saw Plaintiff on three occasions in the February-April, 2002 period. Dr. Zoglio rated as "poor" Plaintiff's ability to remember, maintain attention and sustain concentration. The diagnosis was major depression, alcohol dependence and dementia caused by a head injury. (Tr. 622-629).

R. Gregory Rohs, M.D. is apparently the Medical Director at Mountaincrest Nursing Home. Dr. Rohs reported in August, 2003 that Plaintiff was transferred to the nursing home after treatment at Mercy Franciscan Hospital for a perforated ulcer. Dr. Rohs diagnosed Plaintiff with a "mood disorder," but commented that Plaintiff was "mildly depressed" and that his memory was "relatively intact." (Tr. 653-654).

Gary Ray, M.D., evaluated Plaintiff in May, 2004. Plaintiff reported to Dr. Ray that he

6

injured his shoulder when he slipped on ice and fell into the telephone pole. Plaintiff's major complaint was pain in the right shoulder upon heavy lifting. The injury to his right ankle also occurred as a result of a fall. Plaintiff's major complaint was pain, swelling and loss of motion in the right ankle after standing or walking for long periods of time. Plaintiff also complained of memory loss following the traumatic brain injury. Dr. Ray opined that Plaintiff could lift 25 lbs. occasionally and 20 lbs. frequently. He could stand/walk at least 2 hours in a workday. He should never climb, balance or crawl, but he could occasionally kneel, crouch and stoop. He should avoid hazzards. He could occasionally reach with the right arm. Dr. Ray's findings included mild weakness and decreased range of motion in the right shoulder and ankle resulting from previous fractures. Dr. Ray also predicted that Plaintiff "would have difficulty performing a higher level of cognitive activities." (Tr. 671-681).

Lastly, Plaintiff was examined by Norman Berg, Ph.D., a clinical psychologist, in May, 2004. Dr. Berg agreed that Plaintiff should be diagnosed as having alcohol dependence and polysubstance abuse, both of which are in remission, as well as a depressive disorder and a personality disorder. Dr. Berg described Plaintiff as "mildly depressed." Dr. Berg referred to Plaintiff's memory processes as "at least fair with no major impairment noted." He also stated that Plaintiff "would have no limitations in his ability to maintain attention and concentration." (Tr. 682-687). Dr. Berg assigned a GAF of 64.

## OPINION

The following principles of law control resolution of the issues raised in this case. Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d

7

359 (6th Cir. 1978).

      To qualify for SSI benefits, plaintiff must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. § 1382(a); 20 C.F.R. § 416.202. Eligibility is dependent upon disability, income, and other financial resources. 20 C.F.R. § 416.202. To establish disability, plaintiff must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than twelve months. Plaintiff must also show that the impairment precludes performance of the work previously done, or any other kind of substantial gainful employment that exists in the national economy. 20 C.F.R. § 416.905.

      Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520. First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). Fourth, if the individual's impairments do not meet or equal those in the Listing, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

      The Commissioner is required to consider plaintiff's impairments in light of the Listing of Impairments. 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listing). The Listing sets forth certain impairments which are presumed to be of sufficient severity to prevent the performance of work.

20 C.F.R. § 404.1525(a). If plaintiff suffers from an impairment which meets or equals one set forth in the Listing, the Commissioner renders a finding of disability without consideration of plaintiff's age, education, and work experience. 20 C.F.R. § 404.1520(d); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

Plaintiff's impairment need not precisely meet the criteria of the Listing in order to obtain benefits. If plaintiff's impairment or combination of impairments is medically equivalent to one in the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). To determine medical equivalence, the Commissioner compares the symptoms, signs, and laboratory findings concerning the alleged impairment with the medical criteria of the listed impairment. 20 C.F.R. § 404.1526(a). The decision is based solely on the medical evidence, which must be supported by medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. § 404.1526(b).

If plaintiff's alleged impairment is not listed, the Commissioner will decide medical equivalence based on the listed impairment that is most similar to the alleged impairment. 20 C.F.R. § 404.1526(a). If plaintiff has more than one impairment, and none of them meet or equal a listed impairment, the Commissioner will determine whether the combination of impairments is medically equivalent to any listed impairment. *Id*.

The grid is designed for use when the alleged impairment manifests itself through limitations in meeting the strength requirements of jobs. 20 C.F.R. Subpart P, Appendix 2, § 200.00(e). If plaintiff suffers solely from nonexertional impairments, the grid is inapplicable and the Commissioner must rely on other evidence to rebut plaintiff's prima facie case of disability. *Id*., § 200.00(e)(1). Nonexertional impairments include "certain mental, sensory, [and] skin impairments" as well as "postural and manipulative limitations [and] environmental restrictions." 20 C.F.R. Subpart P, Appendix 2, § 200.00(e). Where a plaintiff suffers from an impairment or a combination of impairments that results in both exertional and nonexertional limitations, the grid is consulted to see if a finding of disability is directed based upon the strength limitations alone. If not, the grid is then used as a framework and the Commissioner examines whether the nonexertional limitations further diminish plaintiff's work capability and preclude any types of jobs. *Id*., § 200.00(e)(2). If an individual suffers from a nonexertional impairment that restricts

9

performance of a full range of work at the appropriate residual functional capacity level, the Commissioner may use the grid as a framework for a decision, but must rely on other evidence to carry his burden. *Abbott v. Sullivan*, 905 F.2d 918, 926-27 (6th Cir. 1990); *Damron v. Secretary of H.H.S.*, 778 F.2d 279, 282 (6th Cir. 1985); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 528-29 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). The existence of a minor nonexertional impairment is insufficient to preclude use of the grid for directing a decision. Rather, plaintiff must demonstrate that the nonexertional impairment "significantly limits" his ability to do a full range of work at the appropriate exertional level in order to preclude a grid based decision. *Atterberry v. Secretary of H.H.S.*, 871 F.2d 567, 572 (6th Cir. 1989); *Cole v. Secretary of H.H.S.*, 820 F.2d 768, 771-72 (6th Cir. 1987); *Kimbrough v. Secretary of H.H.S.*, 801 F.2d 794, 796 (6th Cir. 1986).

When the grid is not applicable, the Commissioner must make more than a generalized finding that work is available in the national economy; there must be "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform *specific* jobs." *Richardson v. Secretary of H.H.S.*, 735 F.2d 962, 964 (6th Cir. 1984) (per curiam) (emphasis in original); *O'Banner v. Secretary of H.E.W.*, 587 F.2d 321, 323 (6th Cir. 1978). Taking notice of job availability and requirements is disfavored. *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 536-37 n.7, 540 n.9 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). There must be more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *Richardson*, 735 F.2d at 964; *Kirk*, 667 F.2d at 536-37 n.7. The Commissioner is not permitted to equate the existence of certain work with plaintiff's capacity for such work on the basis of the Commissioner's own opinion. This crucial gap is bridged only through specific proof of plaintiff's individual capacity, as well as proof of the requirements of the relevant jobs. *Phillips v. Harris*, 488 F. Supp. 1161 (W.D. Va. 1980)(citing *Taylor v. Weinberger*, 512 F.2d 664 (4th Cir. 1975)). When the grid is inapplicable, the testimony of a vocational expert is required to show the availability of jobs that plaintiff can perform. *Born v. Secretary of H.H.S.*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Varley v. Secretary of H.H.S.*, 820 F.2d 777, 779 (6th Cir. 1987).

A mental impairment may constitute a disability within the meaning of the Act. *See* 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A). However, the mere presence of a mental impairment does not establish entitlement to disability benefits. In order for a claimant to recover benefits,

10

the alleged mental impairment must be established by medical evidence consisting of clinical signs, symptoms and/or laboratory findings or psychological test findings. 20 C.F.R. Pt. 404, Subpt. P, App.1, § 12.00(B); *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

Alleged mental impairments are evaluated under the same sequential analysis as physical impairments. Once the Commissioner determines that a mental impairment exists, he/she must then evaluate the degree of functional loss it causes according to a special procedure. 20 C.F.R. §§ 404.1520a and 416.920a. A standard document, called the Psychiatric Review Technique Form, must be completed at each level of administrative review. This form, which corresponds to the Listing of Impairments for mental impairments, lists the signs, symptoms, and other medical findings which establishes the existence of a mental impairment.

The special procedure then requires a rating of the degree of functional loss resulting from the impairment. 20 C.F.R § 404.1520a(b)(3). Plaintiff's level of functional limitation is rated in four areas: 1) activities of daily living; 2) social functioning; 3) concentration, persistence, and pace; and 4) deterioration or decompensation in work or work-like settings. *See Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1993)(per curiam). The first two areas are rated on the following scale: none, slight, moderate, marked, and extreme. The third is rated: never, seldom, often, frequent, or constant. The fourth is rated: never, once or twice, repeated, or continual. If an individual's limitations are rated as none or slight in the first two areas, never or seldom in the third, and never in the fourth, the mental impairment will normally be found to be not severe. 20 C.F.R. § 404.1520a(c)(1). Any other ratings may be considered severe. A rating of marked, extreme, frequent, constant, repeated, or continual constitutes a degree of limitation that is incompatible with the ability to work. 20 C.F.R. § 404.1520a(b)(3).

Where the mental impairment is found to be severe, a determination must then be made as to whether it meets or equals a listed mental disorder. If it does not, the Commissioner must then complete a Mental Residual Functional Capacity Assessment form. This form also seeks to evaluate functional loss; however, it is intended to provide a more

detailed analysis than that provided by the Psychiatric Review Technique form. The Commissioner must determine if this mental residual functional capacity is compatible with the performance of the individual's past relevant work, and if not, whether other jobs exist in significant numbers in the economy that are compatible with this assessment. *See* 20 C.F.R. §§ 404.1520(e)-(f), 404.1520a(c).

A treating physician's opinion is entitled to weight substantially greater than that of a nonexamining medical advisor or a physician who saw plaintiff only once. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048, 1054 (6th Cir. 1983). A summary by an attending physician made over a period of time need not be accompanied by a description of the specific tests in order to be regarded as credible and substantial. *Cornett v. Califano,* No. C-1-78-433 (S.D. Ohio Feb. 7, 1979) (LEXIS, Genfed library, Dist. file). A physician's statement that plaintiff is disabled is not determinative of the ultimate issue. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984). The weight given a treating physician's opinion on the nature and severity of impairments depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record. 20 C.F.R. § 404.1527(d); *Harris v. Heckler*, 756 F.2d 431 (6th Cir. 1985). If not contradicted by any substantial evidence, a treating physician's medical opinions and diagnoses are afforded complete deference. *Harris*, 756 F.2d at 435. *See also Cohen v. Secretary of H.H.S.*, 964 F.2d 524, 528 (6th Cir. 1992). While the Commissioner may have expertise in some matters, this expertise cannot supplant the medical expert. *Hall v. Celebrezze,* 314 F.2d 686, 690 (6th Cir. 1963); *Lachey v. Secretary of H.H.S.*, 508 F. Supp. 726, 730 (S.D. Ohio 1981).

It is the Commissioner's function to resolve conflicts in the medical evidence and to determine issues of credibility. *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994); *Hardaway v. Secretary of H.H.S.*, 823 F.2d 922, 928 (6th Cir. 1987); *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984). The Commissioner's determination must stand if it is supported by substantial evidence regardless of whether the reviewing court would resolve the conflicts in the evidence differently. *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). *See also Boyle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993); *Tyra v. Secretary of H.H.S.*, 896 F.2d 1024, 1028 (6th Cir. 1990). The Commissioner must state not only the evidence considered which supports the

conclusion but must also give some indication of the evidence rejected in order to facilitate meaningful judicial review. *Hurst v. Secretary of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985). *See also Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987).

If the Commissioner's decision is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted. The Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 111 S. Ct. 2157, 2163 (1991).

Where the Commissioner has erroneously determined that an individual is not disabled at steps one through four of the sequential evaluation, remand is often appropriate so that the sequential evaluation may be continued. *DeGrande v. Secretary of H.H.S.*, 892 F.2d 1043 (6th Cir. Jan. 2, 1990) (unpublished, available on Westlaw). Remand is also appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). Remand ordered after a hearing on the merits and in connection with an entry of judgment does not require a finding that the Commissioner had good cause for failure to present evidence at the prior administrative hearing. *Faucher*, 17 F.3d at 173.

Benefits may be immediately awarded "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher*, 17 F.3d at 176. *See also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 782 (6th Cir. 1987). The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. *Faucher*, 17 F.3d at 176. *See also Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994); *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985).

Plaintiff first Statement of Error is that the ALJ erred by failing to adopt the findings of Dr. Zoglio, Plaintiff's treating psychiatrist. We have no dispute with Plaintiff's argument that a

13

treating physician's opinion be given controlling weight if supported by objective evidence. However, the ALJ's failure to adopt the opinion of Dr. Zoglio can be supported in two ways. First, and least important, is the undeniable fact that Plaintiff saw Dr. Zoglio only three times in the Spring of 2002, so there does not exist a long professional relationship between doctor and patient. Second and more importantly, Dr. Zoglio's opinion in reference to the extent of Plaintiff's inability to function is not shared by most professionals, although Dr. Melvin seemed to agree. Dr. Watanabe described Plaintiff's memory as "very good" and further described his cognitive deficits as "mild." Dr. Watanabe's observations took place in 2000, approximately one year after Plaintiff sustained the brain injury, which is one of two reasons for Plaintiff's cognitive problems, the other being his alcohol and polysubstance dependence. Dr. Bouman, the clinical psychologist at Drake Hospital, where Plaintiff resided after his traumatic brain injury, indicated that Plaintiff's sustained attention was somewhat impaired and that he had difficulty with tasks involving memory, but she never described any of Plaintiff's cognitive deficits as serious or marked.

Dr. Gabis, also a clinical psychologist, noted in 1990 that Plaintiff's memory "appeared intact" and his ability to focus and attend was "within normal limits." Dr. Casterline, also a clinical psychologist felt that Plaintiff's memory and ability to concentrate were "intact." Dr. Marlow, also a clinical psychologist, rated as "moderate" Plaintiff's limitations relative to the ability to concentrate and persist. Dr. Gabis repeated his evaluation of Plaintiff in 2001. Dr. Gabis noted that Plaintiff's cognitive function improved while he was in a structured environment, but "deteriorated significantly when he was discharged into the community."

In 2002, Dr. Melvin had the occasion to evaluate Plaintiff. Dr. Melvin voiced the opinion that Plaintiff's limitation in the area of concentration and persistence was "marked." However, Dr. Rohs found Plaintiff's memory to be "relatively intact" in 2003. Dr. Berg described Plaintiff's memory as "at least fair" and found no limitations regarding Plaintiff's ability to attend and concentrate.

While no medical source attempts to distinguish how much cerebral or cognitive damage was attributable to substance abuse and alcoholism and how much is due to the traumatic brain injury, we can say for sure that the brain injury certainly did not enhance Plaintiff's cognitive

abilities. However, the issue is further complicated by Plaintiff's refusal to accept medical advice and cease drinking after sustaining the brain injury.

Although the ALJ does not spend a lot of time discussing the differing opinions in the record, it would seem logical to put the most faith in those opinions which post-dated Plaintiff's traumatic brain injury in November, 1999. These are the opinions of Drs. Watanabe, Bouman, Gabis, Casterline, Zoglio, Melvin and Berg. Drs. Zoglio and Melvin filed reports most favorable to Plaintiff, but only Dr. Melvin rated a single limitation, Plaintiff's ability to concentrate, as serious or marked. Dr. Zoglio performed no residual functional capacity analysis. On the other hand, Drs. Watanabe, Casterline, Bouman and Berg all indicated that Plaintiff had no marked or serious limitations in his ability to remember or concentrate, which are the two impairments about which Plaintiff complained.

The opinion of Dr. Berg, a clinical psychologist, who examined, but did not treat Plaintiff, was generally corroborated by the opinions of other mental health professionals. Dr. Zoglio is a treating physician with very minimal contact with Plaintiff. Dr. Zoglio's opinion as well as Dr. Melvin's are not supported by substantial evidence. The ALJ made no error in his reliance upon the opinion of Dr. Berg.

The second error alleged to have been committed by the ALJ is his finding that Plaintiff and his witness, his former wife, were not credible. Actually what the ALJ found was that the testimony provided by Plaintiff and his former wife about the extent of Plaintiff's functional limitations was not credible in light of the medical evidence in the record. Plaintiff testified that he could stand for an hour and walk a mile, but could concentrate for 30 minutes. The residuals from the ankle fracture, which involved some weakness and stiffness in the right ankle, some limitation of motion and some degenerative changes. The reports provided by Drs. Ray, Carter and Johnson plus the x-ray reports of Dr. Rubenstein do not support the argument that Plaintiff can only stand for one hour. The ALJ accepted the opinion of Dr. Ray that Plaintiff could stand/walk for 2 hours in a workday. The ALJ committed no error.

Plaintiff testified that he has trouble lifting overhead with his right shoulder since the collar bone fracture in 1998. The ALJ accommodated this impairment by placing a prohibition against frequent reaching with the right arm. The injury was proved by the x-ray reports and the

surgery by Dr. Wyrick, but the recovery was generally uneventful. The residual effects were some loss of strength and some loss of motion in the right arm. There is no real disagreement over Plaintiff's testimony about the residual effects of the injury and surgical repair. The ALJ made no error in following the limitation suggested by Dr. Ray.

The third Statement of Error was that the ALJ erred by failing to find that Plaintiff met Listing 12.02. Plaintiff can meet Listing 12.02 by meeting the requirements of subsections (A) and (B). Section (A) requires Plaintiff to establish one of the following: (1) disorientation as to time and place or (2) memory impairment, or (3) perceptual or thinking disturbances, or (4) change in personality, or (5) disturbance in mood, or (6) emotional lability, or (7) loss of measured intellectual ability of at least 15 IQ points. In order to meet the requirements of Listing 12.02, Plaintiff must also satisfy the requirements of subsection (B), which requires Plaintiff to demonstrate at least two of the following: (1) marked restriction of the activities of daily living, (2) marked difficulty in maintaining social functioning, (3) marked difficulties in maintaining concentration, persistence or pace, (4) repeated episodes of decompensation. Plaintiff has not met the requirements of Listing 12.02 and the ALJ determination that he did not is correct.

Plaintiff has established that at some time he has experienced some degree of memory impairment and either some degree of mood or personality change, depending upon the proper designation of depression. But the degree of functional impairment required to establish subsection (B) is "marked," meaning more than moderate, but less than extreme. The only medical source provider who indicated a marked impairment was Dr. Melvin and Dr. Marvin's opinion was that Plaintiff displayed a "marked" impairment of his ability to concentrate and persist and to maintain social functioning in 2002. Dr. Zoglio's opinion that Plaintiff demonstrated "poor" ability to perform the activities of daily living, maintain social functioning and maintain concentration and attention. One could equate "poor" ability to perform with a "marked impairment" in performing, so for purposes of argument, we will concede that Plaintiff's claim that he met Listing 12.02 was supported by both Drs. Melvin and Zoglio.

However, the shear bulk of medical opinion is to the contrary. Dr. Berg found no marked impairments and neither did Drs. Watanabe, Bouman, Gabis, Casterline, Marlow or Rohs. While the consensus is clearly that Plaintiff had no marked limitations in any area and clearly suffered

no episodes of decompensation, the ALJ chose to emphasize the opinion of Dr. Berg, one who held to the majority view. While the safer path might have been to emphasize the majority view, rather than put all the cards on Dr. Berg's opinion, the ALJ's ultimate decision was still the correct one.

Lastly, Plaintiff assigns as error the ALJ's decision to follow the Vocational Expert's opinion that Plaintiff had the residual functional capacity to perform a number of light and sedentary jobs. Specifically, Plaintiff complains about the ALJ's alleged failure to follow the recommendations of Dr. Ray, the only physician to express an opinion relative to Plaintiff's right shoulder impairment and his difficulty reaching. Plaintiff's complaint to Dr. Ray was that he had difficulty lifting and reaching overhead with his right arm and that he experienced pain if he moved his arm "the wrong way." Dr. Ray's examination showed normal muscle strength in the right shoulder, but in another place in his report, Dr. Ray indicated a "mild weakness." In any event, there was some decreased range of motion in the right shoulder. The injury to was to Plaintiff's right clavicle, not his shoulder. Dr. Ray imposed a restriction upon all but "occasional reaching." Dr. Ray also indicated that Plaintiff's ability to reach in all directions was limited. The ALJ interpreted Dr. Ray's limitation to apply to only reaching overhead, while Plaintiff's point is that he believes that Dr. Ray restriction was to prevent reaching in any direction. The significance is that Plaintiff's counsel elicited upon cross-examination of the Vocational Expert that if Plaintiff were precluded from occasional reaching in all directions, he could only perform the listed jobs with difficulty.

The ALJ interpreted Dr. Ray's opinion regarding the reaching restriction to apply to overhead reaching in light of Plaintiff's complaint to Dr. Ray and the activities he was able to do, such as cooking, cleaning, laundry, grocery shopping and doing household chores. The injury and Plaintiff's recovery from it does not justify a conclusion that Plaintiff cannot reach frequently in all directions except overhead. Again, the ALJ's decision was correct.

## CONCLUSION

Because the ALJ's decision is supported by substantial evidence, and Plaintiff's alleged errors lack merit, the decision should be affirmed and this case dismissed from the docket of the Court.

March 31, 2008

Timothy S. Hogan
United States Magistrate Judge

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO THIS R&R

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten (10) days after being served with this Report and Recommendation. Pursuant to Fed. R. Civ. P. 6(e), this period is automatically extended to thirteen (13) days (excluding intervening Saturdays, Sundays, and legal holidays) in the event this Report is served by mail, and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).